# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-CC-01213-SCT

*TITAN TIRE OF NATCHEZ, INC.*

*v.*

*MISSISSIPPI COMMISSION ON ENVIRONMENTAL QUALITY*

| | |
|---|---|
| DATE OF JUDGMENT: | 5/23/2003 |
| TRIAL JUDGE: | HON. DENISE OWENS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | LAURA L. GIBBES |
| | KEITH W. TURNER |
| ATTORNEY FOR APPELLEE: | KELLY RENEE' RILEY |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 12/02/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## EN BANC.

## COBB, PRESIDING JUSTICE, FOR THE COURT:

¶1. In December 2001, the Mississippi Department of Environmental Quality (MDEQ) issued a written complaint to Titan Tire of Natchez, Inc. asserting that between the years of 1999 and 2000, Titan violated its National Pollutant Discharge Elimination System (NPDES) permit sixteen times. After unsuccessful attempts to work with MDEQ personnel, Titan was granted an evidentiary hearing before the Mississippi Commission on Environmental Quality, and following a two-day hearing, the Commission found Titan in violation of the permit and fined it $5,000. Aggrieved, Titan appealed to the Hinds County Chancery Court, First Judicial

District, which affirmed the Commission's order.  We conclude that the chancellor's judgment was correct and affirm.

**FACTS**

¶2.    In the early 1980s, Armstrong Tire and Rubber Company (Armstrong) received a permit allowing it to discharge storm water runoff and treated process water into state waters.  In 1987, Fidelity Tire Manufacturing Company (Fidelity) purchased the facility and property from Armstrong and Armstrong's permit was reissued to Fidelity.  Groundwater contamination identified on the site prompted the Mississippi Commission on Environmental Quality (Commission) to issue an order mandating that Fidelity remediate the contaminated soil and groundwater to levels protective of human health and the environment.  Fidelity complied.  Through the years, modifications were made to the permit, and in 1996, Fidelity sought an additional modification to the permit.  This modification was granted on March 12, 1996, but soon thereafter, Fidelity filed for bankruptcy and never made the modifications provided for in the 1996 permit.  Titan Tire of Natchez, Inc. (Titan) purchased the facility in 1998 and began operating under the existing permit.

¶3.    The following time-line details the sequence of events leading up to the present appeal:

| | |
|---|---|
| Early 1980s: | Armstrong obtained NPDES (National Pollutant Discharge Elimination System) Permit No. MS0001287 |
| March 1987: | Fidelity purchased the Armstrong plant |
| August 9, 1988: | NPDES Permit No. MS0001287 was reissued to Fidelity |
| 1990: | The Commission issued an order requiring Fidelity to remediate contaminated soil and groundwater |
| 1991: | NPDES Permit No. MS0001287 was modified |
| January 25, 1994: | NPDES Permit No. MS001287 reissued to Fidelity for a 5 year period (to expire January 24, 1999) |

2

| | |
|---|---|
| 1996: | Fidelity requested a modification to the permit |
| March 12, 1996: | Modification granted |
| September 1998: | Titan purchased Fidelity's facility and applied for a renewal of NPDES Permit No. MS0001287 |
| April, June 1999: | TSS (total suspended solids) violations |
| Aug.-Dec. 1999 | Arsenic violations |
| February 2000: | Arsenic violations |
| June 2000: | NPDES Permit No. MS0001287 reissued to Titan |
| December 2000: | Arsenic violations |
| December 2001: | MDEQ issued formal complaint |

¶4.    For many years, Armstrong used the location and facility for its tire manufacturing business. Because the manufacturing process involved a discharge of treated water into a local stream, a NPDES permit[1] was required. In accordance with state law, Armstrong applied for and received NPDES Permit No. MS0001287 from the MDEQ permit board, which allowed discharge of stormwater runoff and treated process water.

¶5.    When Armstrong sold the facility to Fidelity, the permit board reissued the permit to Fidelity. Groundwater contamination was discovered on Fidelity's site, prompting an investigation by MDEQ's Hazardous Waste/Uncontrolled Site Branch. The contaminate of concern was identified as naphtha and its associated compounds. This discovery prompted MDEQ's Hazardous Waste Branch and Fidelity to enter an agreed order requiring Fidelity to install a remediation system which would treat the contaminated groundwater and then discharge the treated water into state surface waters.

¶6.    Although MDEQ's Hazardous Waste Branch possessed authority to issue the order

---

[1] The general purpose of a NPDES permit is to regulate industrial and municipal wastewater discharges.

3

mandating the installation of the remediation system, the necessary NPDES permit could only be issued by MDEQ's Environmental Permitting Branch. The discharge from Titan's remediation system did not easily conform to the NPDES permit regulations, because ordinarily industrial and municipal wastewater systems maintain a constant discharge volume, but the volume of discharge resulting from a remediation system such as the one installed by Fidelity generally was not a constant volume.

¶7. A facility experiencing problems with an industrial wastewater system ordinarily has the authority to cease operations or modify the manufacturing process while correcting the malfunction. Titan's situation, however, was unique in that the site must operate according to the agreed order which required Titan to continuously operate the remediation system to discharge the wastewater associated with the system. Thus Titan argued that MDEQ would not allow Titan to turn off the remediation system when problems arose.

¶8. MDEQ provided Titan with several alternatives that could have eliminated the problem. MDEQ also informed Titan that the agency would consider making arrangements for Titan to close the pump and treat system, allowing the contaminated groundwater to naturally attenuate. However, Titan never demonstrated how natural attenuation would be effective at the site, so MDEQ never allowed the system to be shut down.

¶9. In 1996, a modified NPDES permit had been issued to Fidelity so that it could install additional groundwater monitoring wells to further determine the existing contamination. Once the wells were in place, the quantity of water treated and discharged by the system would have increased. Because the modified NPDES permit *increased* the amount of water

4

discharged, the allowable concentration levels for contaminants was *decreased*. To put it another way, because the mass quantity of any regulated substance discharged must not exceed a certain limit, the discharge of higher quantities of water means that lower concentration levels of the substance must exist in the water.

¶10. Although the modified 1996 NPDES permit was issued to Fidelity, the anticipated groundwater wells were never installed, and Fidelity filed bankruptcy soon after the modified permit was granted. In 1998, Titan purchased the facility and began operations, and according to MDEQ, Titan became responsible for all environmental conditions of the property and facility, including adherence to the modified NPDES permit and the remediation system. Titan argued that MDEQ should not have enforced the permit against it since the additional groundwater wells were never installed.

¶11. MDEQ took the position that Titan conducted due diligence when purchasing the facility, and it was responsible for all environmental conditions of the facility including compliance with the NPDES permit. MDEQ additionally maintained that because Titan failed to request any modifications to the existing permit, Titan assumed responsibility for the conditions specified in the 1996 modified NPDES permit. When the modified permit expired and Titan subsequently applied for a new permit, Titan never requested a modification to the 1996 permit, and the permit levels in the renewed NPDES permit remained the same as established in the 1996 permit.

¶12. Titan retained some of Fidelity's employees during Titan's purchase of the facility, and one of these employees was Ken Young, Fidelity's environmental manager (who later held the

same position with Titan).  MDEQ claimed that as a result of this position with both companies, Young was familiar with the conditions of Fidelity's, and later Titan's, permits. Titan, however, responded to this accusation that Young was an employee of Fidelity during the relevant time period and was therefore not acting on behalf of Titan.

¶13.   Titan also asserted that MDEQ applied a flawed method for the calculation of the concentration of regulated substances.  Although Titan argued that the permit should be based on mass limits, the NPDES permits are based on concentration limits.  Titan explained the practical differences between the two limits as follows:  when a facility reduces its water flow or has a volume of discharge below that set forth in its NPDES permit, it might exceed its concentration permit limit despite having reduced the total mass of the regulated substances in the discharge.  Conversely, if a facility was allowed to comply with mass based limits that recognized the total pollutant load allowed in the flow, then a reduction in the flow would not cause a violation even with an increase in the concentration levels.  Titan referred to MDEQ's adherence to the concentration limit permit as a flaw which has been recognized by the EPA.

## ANALYSIS

¶14.   "The scope of review of the findings and actions of an administrative agency is well established." *Miss. Comm'n on Envtl. Quality v. Chickasaw County Bd. of Supervisors*, 621 So.2d 1211, 1215 (Miss. 1993).  "When an agency interprets a statute that it is responsible for administering, we must defer to the agency's interpretation so long as the interpretation is reasonable." *Parkerson v. Smith*, 817 So.2d 529, 534 (Miss. 2002) (*citing Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S. Ct. 2778, 2782,

6

81 L. Ed. 2d 694 (1984)). Rather than applying its own interpretation when the applicable statute is silent or ambiguous regarding a specific question, the court determines whether the agency's interpretation was reasonable. *Chevron*, 467 U.S. at 843-44. "The reviewing court is concerned only with the reasonableness of the administrative order, not its correctness." *Miss. Dep't on Envtl. Quality v. Weems*, 653 So.2d 266, 281 (Miss. 1995).

¶15. Rather than reviewing an administrative agency decision de novo, this Court has set forth the following factors to be taken into account when determining whether a reviewing court should uphold an agency's order:

> Administrative agencies must perform the functions required of them by law. When an administrative agency has performed its function, and has made the determination and entered the order required of it, the parties may then appeal to the judicial tribunal designed to hear the appeal. The appeal is a *limited* one... since the courts cannot enter the field of the administrative agency. *The court will entertain the appeal to determine whether or not the order of the administrative agency (1) was supported by substantial evidence, (2) was arbitrary or capricious, (3) was beyond the power of the administrative agency to make, or (4) violated some statutory or constitutional right of the complaining party*.

*Weems*, 653 So.2d at 273 (emphasis added) (*citing* *Miss. State Tax Comm'n v. Package Store, Inc.*, 208 So.2d 46, 48 (Miss. 1968). *See also* *Montalvo v. Miss. State Bd. of Med. Licensure*, 671 So.2d 53, 55-56 (Miss. 1996). "These are the only grounds for overturning an agency action; otherwise, the agency's determination must remain undisturbed." *Chickasaw County*, 621 So.2d at 1215. In addition, "[t]he burden of proof rests with the party challenging the actions of an administrative agency." *Elec. Data Sys. Corp. v. Miss. Div. of Medicaid*, 853 So 2d 1192, 1204-05 (Miss. 2003) (*citing* *Melody Manor Convalescent Ctr. v. Miss. State*

7

***Dep't of Health***, 546 So.2d 972, 974 (Miss. 1989).

*(1) Substantial Evidence*

¶16. In considering this first factor, this Court has held that "[s]ubstantial evidence is not such a malleable term of art that it may escape definition. Indeed, we have defined substantial evidence as evidence that a reasonable person would accept as adequate to support a conclusion." ***Tucker v. Prisock***, 791 So.2d 190, 192 (Miss. 2001). In addition, substantial evidence is something "'more than a mere scintilla of evidence' or 'something less than a preponderance of the evidence but more than a scintilla or glimmer.'" ***Weems***, 653 So.2d at 280-81. *Accord,* ***Falco Lime, Inc. v. Mayor & Aldermen of Vicksburg***, 836 So.2d 711, 721 (Miss. 2002). "The reviewing court is 'only to determine whether substantial evidence supports the agency's decision and whether the agency exercised its discretion reasonably and with due consideration.'" ***Weems***, 653 So.2d at 280 (*citing* 2 Am. Jur. 2d *Administrative Law* § 537 Substantial Evidence Standard (1994)).

¶17. The Commission was presented with discharge monitoring reports submitted by Titan indicating that Titan had exceeded the limits contained in the NPDES permit. A permit has been violated when maximum limitations contained in the permit have been exceeded. Substantial evidence regarding the actions of both Titan and MDEQ was presented to the Commission during the two-day evidentiary hearing.

*(2) Arbitrary or capricious*

¶18. A second factor to be considered when determining whether an agency's order was

8

appropriate is whether the order was "arbitrary or capricious." *Weems*, 653 So.2d at 273. This

Court has held that:

> [a]n act is arbitrary when it is done without adequately determining principle; not done according to reason or judgment, but depending upon the will alone,-- absolute in power, tyrannical, despotic, non-rational,--implying either a lack of understanding of or a disregard for the fundamental nature of things... An act is capricious when it is done without reason, in a whimsical manner, implying either a lack of understanding of or a disregard for the surrounding facts and settled controlling principles.

*Elec. Data Sys. Corp. v. Miss. Div. of Medicaid*, 853 So 2d at 1205. An agency has acted

arbitrarily and capriciously "if the agency 'entirely failed to consider an important aspect of

the problem,'" or provided a reasoning that was inconsistent with the evidence presented.

*Weems*, 653 So.2d at 281.

¶19. This Court has held "[w]hether a decision is arbitrary and capricious seems to have

melted somewhat into the substantial evidence standard . . . . 'a holding which is supported by

substantial evidence cannot be arbitrary and capricious.'" *Falco Lime*, 836 So.2d at 721

(*citing* *Miss. Bureau of Narcotics v. Stacy*, 817 So.2d 523, 526 (Miss. 2002)). Although

Titan contends that the order was not supported by substantial evidence, the record of the

hearing belies that contention. Between April 1999 and December 2000, Titan violated the

NPDES permit 16 times. Although Titan could have been fined a maximum of $400,000, the

Commission fined Titan only $5,000. MDEQ provided evidence of the violations during the

evidentiary hearing. According to the NPDES permit, Titan is required to submit discharge

monitoring reports (DMRs). The information contained in these DMRs was presented at the

9

evidentiary hearing. In 1999 and 2000, Titan violated the maximum arsenic and TSS limits set in the NPDES permit. Witnesses for both parties were examined, cross-examined, and questioned by the Commission. Upon examination of the evidence, the Commission was able to determine that "[t]he discharge levels reported in the DMRs for the months listed in the complaint letter exceed the levels allowed by the permit." Thus, the Commission's decision was not arbitrary or capricious.

### *(3) The power of the administrative agency*

¶20. The third factor to be considered is whether the administrative agency has the power to make the decision which is being challenged. The Commission is authorized under Miss. Code Ann. §§ 49-17-1 through 49-17-43 to impose a penalty of up to $25,000 for each violation of a statute or regulation. Based upon the violations committed by Titan and following an evidentiary hearing by the Commission, the Commission possessed substantial evidence to impose a moderate penalty of $5,000 for the violations.

¶21. Miss. Code Ann. § 49-17-43 also provides factors for the Commission to consider when determining whether a company should be fined. The Commission's order addresses each applicable factor and provides a statement of the Commission's findings.

¶22. Titan argues that the methodology used to determine the permit's concentration limits was flawed. Titan offered evidence that the Environmental Protection Agency allows for companies to use mass limits. On being questioned by Commissioner Billy Van Devender, Titan's expert witness Dr. Gazi George testified that had the limits been "properly done, represented by mass balance, we would not be anywhere close to those limits [concentration

10

limits contained in the NPDES permit]." Although Titan offered evidence in support of mass limits, Titan's permit was based on concentration limits and the permit was violated. In addition, the EPA allows for both limits to be used.

¶23. This Court "give[s] great deference to the administrative agency in interpreting its own regulations." *Weems*, 653 So.2d at 273. Based on the expertise of MDEQ, this Court defers to MDEQ's decision regarding the methodology limits the agency implements. The Commission's order was within its power when determining whether the permit was "fatally flawed" under the methodology implemented.

### (4) Violation of statutory or constitutional rights

¶24. The fourth and final factor to be considered is whether the order violated Titan's statutory or constitutional rights. Titan argues that MDEQ enforced penalties against only Titan, while the agency failed to take any action against an adjacent facility that "is the likely source of the contamination at issue here." Titan considers this as "selective enforcement" and therefore inadmissible. (*citing Everwood Treatment Co. v. EPA*, 1998 WL 1674543 (S.D. Ala. Jan. 21, 1998). Titan asserts that in order to prove that selective enforcement has occurred, the defendant must show that government officials have not prosecuted others for the same conduct prosecuted against the defendant. However, Titan quotes the requirement for "selective enforcement" while *omitting* the remainder of the second prong of the test: "'[t]he decision to prosecute this defendant was based upon impermissible grounds *such as race, religion or the exercise of constitutional rights*.'" (emphasis added) (*citing Rybachek v. United States*, No. 91-35160, 1993 WL 385454, at 4 (9th Cir. Sept. 29, 1993) (an

11

unpublished opinion)).

¶25. In agreement with the chancery court, we hold that Titan's constitutional rights of equal protection have not been violated. We conclude, as did the chancery court, that Titan has not proved either prong of the test. Titan has not demonstrated that it was singled out, nor that it was selected for prosecution based upon protected classifications.

## CONCLUSION

¶26. We agree with the Hinds County Chancery Court that substantial evidence supported the Commission's decision to fine Titan $5000. Further, the Commission's decision was neither arbitrary nor capricious. In addition, Titan failed to present evidence that the Commission acted outside its power and authority or that it violated Titan's constitutional right of equal protection. We affirm the judgment of the Hinds County Chancery Court.

¶27. **AFFIRMED.**

**SMITH, C.J., WALLER, P.J., EASLEY, CARLSON, GRAVES, DICKINSON AND RANDOLPH, JJ., CONCUR. DIAZ, J., NOT PARTICIPATING.**